STATE OF MINNESOTA

HENNEPIN COUNTY

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type: Other Civil

| | |
|---|---|
| JENNIFER COTTON, individually and on behalf of classes of similarly situated individuals,<br><br>                    Plaintiff,<br><br>v.<br><br>UNITEDTEL, LLC,  a New York limited liability company, a division of CLICKSPARK, LLC  a New York limited liability company, ENHANCED SERVICES BILLING, INC., a Delaware Corporation,<br><br>                    Defendants. | No.<br><br><br><br>**SUMMONS**<br><br>DEMAND FOR JURY TRIAL<br><br><u>CLASS ACTION</u> |

## THE STATE OF MINNESOTA TO THE ABOVE-NAMED DEFENDANTS

## UNITEDTEL, LLC AND CLICKSPARK, LLC:

You are hereby summoned and required to serve on Plaintiff's attorney an Answer to the Complaint, which is herewith served on you and which is on file in the office of the Court Administrator of the above-named Court, within twenty (20) days after service of this Summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

Civil cases are subject to Alternative Dispute Resolution processes as provided in Rule 114 of the General Rules of Practice for the District Courts. Alternative Dispute Resolution includes mediation, arbitration, and other processes set forth in the rules. You

may contact the Court Administrator for information about these processes and about

resources available in your area. Alternative Dispute Resolution does not affect your

obligation to respond to the Summons and Complaint within twenty (20) days.

Dated: February 18, 2009          LOCKRIDGE GRINDAL NAUEN P.L.L.P.

By

Robert K. Shelquist (MN #0213105)
Matthew R. Salzwedel (MN #0312903)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:   (612) 339-6900
Fax:   (612) 339-0981
rkshelquist@locklaw.com
mrsalzwedel@locklaw.com

Myles McGuire
KamberEdelson, LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel:   (312) 589-6370
Fax:   (312) 589-6378
mmcguire@kamberedelson.com

*Attorneys for Jennifer Cotton, individually, and on behalf of classes of similarly situated individuals*

STATE OF MINNESOTA

HENNEPIN COUNTY

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type:  Other Civil

| | |
|---|---|
| JENNIFER COTTON, individually and on behalf of classes of similarly situated individuals, <br><br> Plaintiff, <br><br> v. <br><br> UNITEDTEL, LLC, a New York limited liability company, a division of CLICKSPARK, LLC a New York limited liability company, ENHANCED SERVICES BILLING, INC., a Delaware Corporation, <br><br> Defendants. | No. <br><br><br> **COMPLAINT** <br><br> DEMAND FOR JURY TRIAL <br><br> <u>CLASS ACTION</u> |

## CLASS ACTION COMPLAINT

Plaintiff Jennifer Cotton ("Cotton" or "Plaintiff"), by and through her undersigned attorneys, brings this class action complaint against Defendants on behalf of herself and all others similarly situated based on Defendants' practice of charging telephone subscribers for services they never authorized.  For her class-action complaint, Plaintiff alleges as follows on personal knowledge regarding herself and her own acts and experiences, and, regarding all other matters, on information and belief, including the investigation conducted by her attorneys.

## PARTIES

1.      Plaintiff Jennifer Cotton is an individual residing in and a citizen of Hennepin County, State of Minnesota.

2.      Defendant UnitedTel, LLC ("UnitedTel") provides products and services known as premium telephonic content ("premium content") in the United States. UnitedTel is a New York LLC headquartered in New York. UnitedTel does business throughout the United States and in this County.

3.      Defendant ClickSpark, LLC ("ClickSpark") provides premium-content products and services in the United States.   ClickSpark is a New York LLC headquartered in California. ClickSpark does business throughout the United States and in this County.  ClickSpark is the owner, operator, and marketer of numerous mobile and landline premium services, including those that ClickSpark's subsidiary, UnitedTel, LLC, offers to landline telephone subscribers.

4.      Defendant UnitedTel is a subsidiary of Defendant ClickSpark.

5.      Enhanced Services Billing, Inc. ("ESBI") is a billing processor, or "aggregator," that bills landline telephone consumers for premium-content services provided by third-parties such as Defendant UnitedTel. Premium content for landline telephones consists of, among other things, games, coupons, dieting tips, fax services, business advice, and other products and services.  ESBI is a Delaware corporation with its headquarters and principal place of business in the State of Texas.  It does business throughout the State of Minnesota and in this County.

2

## JURISDICTION & VENUE

6.     Venue is proper under Minn. Stat. § 542 because Plaintiff's cause of action or some part thereof arose in this county.

7.     This Court has personal jurisdiction over Defendants.

## FACTUAL BACKGROUND

8.     Today's telephones are far more complex instruments than the traditional landline-based telephones of the past. Instead of mere tools for sending and receiving telephone calls, modern telephones – both landlines and mobile phones – are increasingly used by consumers to transact commerce with third parties, much like a common credit card. This increased functionality permits telephone subscribers to purchase a vast variety of products and services provided by a rapidly growing industry of third-party vendors such as Defendants. These additional products and services are collectively referred to in the telecommunications industry as "premium content" telephonic services.

9.     For landline telephone subscribers, premium content ranges from web-hosting products, to email accounts, to diet-monitoring services such as Defendant UnitedTel's "FindYourDiet.com" which, according to a ClickSpark website, purports to offer subscribers the ability to:

> Lose 10 pounds in 5 weeks . . . Guaranteed . . . . FindYourDiet.com will use our state of the art customized diet plan technology to put you on the perfect weight loss plan to suit your needs.

10.     In this case, in exchange for UnitedTel's "personalized diet plan," subscribers are simply "billed a low monthly service fee of $14.95 that will automatically

3

be included on [their] local telephone bill. No credit check or long-term contract is required."

11.    Many premium content third-party vendors, such as Defendants ClickSpark and UnitedTel, do not distinguish between mobile and landline premium content other than in their marketing materials. For cost-efficiency purposes, these third-party vendors elect instead to consolidate and streamline into a single operation the creation, billing, and marketing of such products and services.

12.    Despite the existence of a centralized operation, however, ClickSpark maintains the appearance of different and unrelated activities through its numerous subsidiaries and other affiliates, such as FindYourDiet.com, to conceal from the public and governmental agencies the breadth of its fraudulent conduct.

13.    Indeed, ClickSpark is one of a plethora of companies that create premium content and market it under the names of small, nominally independent entities such as "SmartDiets.com," "247MP3s.com," and "FindYourDiet.com," all of which are controlled by the same owners as ClickSpark and UnitedTel.

14.    Although companies such as ClickSpark and its subsidiaries create and often market premium content themselves, telephone subscribers are not billed directly by these premium-content vendors. Instead, premium-content vendors, such as UnitedTel, partner through middlemen with companies known as "aggregators," such as M-Qubem-Qube, Inc. ("M-Qubem-Qube") for cell phone premium content, and Defendant Enhanced Billing Services, Inc. ("ESBI") for landline premium content.

15.     These aggregators serve as a conduit between the numerous, diverse, and comparatively small premium-content vendors as well as the large, national telephone carriers, such as AT&T, and facilitate the premium-content vendors' ability to: (i) use a national carrier's network to deliver their services to that carrier's subscribers; and/or (ii) use a national carrier's billing system to collect payment for their premium-content services from that carrier's subscribers.   In return, the aggregators and the national carriers each keep a percentage of the premium-content charges.

16.     The premium-content industry generates vast revenue for all parties involved: the premium-content vendors, such as Defendants UnitedTel and ClickSpark; the aggregators such as M-Qube and Defendant ESBI; the national telephone carriers such as AT&T; and even affiliate marketers such as ClickSpark.

17.     Not all of this revenue, however, has been legitimately and lawfully collected.   Misleading marketing representations made by premium-content vendors, such as UnitedTel and their affiliate marketer partners, such as ClickSpark, as well as the lack of commercial viability of many of Defendants' "services" are the primary sources of the problem.   Indeed, after revealing that they had deceived consumers through fraudulent Internet marketing tactics, in 2007 ClickSpark's principals settled a consumer-fraud lawsuit brought against them by the State of Washington Attorney General's Office.   Shortly thereafter, ClickSpark's principals resumed such untoward activity in their marketing of premium-content services, including those that appeared on the telephone bill of Plaintiff.

5

## Deceptive Marketing Gone Rampant

18.   Defendants UnitedTel and ClickSpark's methods for determining subscribers' authorization to receive their premium content continue to be highly problematic as they contract on behalf of themselves and their subsidiaries with affiliate marketers who frequently depend on little more than information readily available through the public domain, such as one's name and telephone number.

19.   In comparison, a consumer who uses a check to make a transaction or purchase must sign it to prove he or she has authorized payment. Many merchants also require check users to produce an additional form of identification such as a drivers' license or state-issued ID. An issuing bank then examines that signature to verify whether the consumer actually authorized payment.

20.   Similarly, a consumer who uses a credit card to make a transaction or purchase must provide, at a minimum, both the credit card number and date of expiration. And more often than not, a credit card user also must sign a receipt or, if the transaction takes place online, provide his or her three-digit credit card security code, the zip code of the credit card holder's billing address, and a matching street address. Credit card providers also have additional levels of security in place to analyze a consumer's particular transaction, based the transaction's similarity to that consumer's previous transactions, to determine the likelihood of whether a particular transaction is the result of fraud or theft.

## Premium-Content Transactions: It only takes a phone number

21.    In stark contrast to these general consumer payment methods, premium-content vendors can bill a consumer for premium-content services once they have the consumer's telephone number, even if the consumer never agreed to purchase the services or was never informed about the charges for such services.

22.    Premium-content vendors such as Defendants only have to provide an aggregator with a cell phone or landline telephone number and the amount of the premium-content charges, and the aggregator simply transmits that information to the national carrier to include on the telephone bill for that cell phone or landline telephone number.

23.    Because the four parties involved – the affiliate marketer, the premium-content vendor, the aggregator, and the national carrier – each keep part of every premium-content charge, they maintain this billing system despite knowing that large numbers of consumers are being billed for premium-content services they neither wanted nor authorized.

24.    This problem is exacerbated because charges for premium-content services often are not clearly identified on subscribers' telephone bills, thereby making it impossible for subscribers to identify the origin or nature of the charges, or to distinguish the charges from the numerous other line-item charges and fees that appear on the average consumer's telephone bill. In addition, because charges for premium-content services are often only a few dollars, subscribers who have recurring third-party charges

may fail to notice such charges, much less expect such charges to even appear on an ordinary telephone bill.

### The Rub: Collecting Unauthorized Charges

25.    A serious flaw with Defendants' business structures, and the collection methods of carriers, aggregators such as ESBI, and premium-content vendors, in general, has developed over time.   The billing and collection systems established by companies, including Defendants, to aid the premium-content industry, are free of any checks or safeguards to prevent erroneous or unauthorized premium-content charges from being included in customers' telephone bills.    Ported or "recycled" telephone numbers, misleading "consent" procedures occurring when customers sign-up for premium content, and the absence of valid signature requirements, age confirmations, and personal code numbers all exacerbate the likelihood of unauthorized or false charges for premium content.

26.    Aggregators, premium-content vendors, and national carriers bill and collect charges for premium-content services in many cases where the consumer never gave his or her authorization to receive and be billed for the content.

27.    The practice of collecting unlawful premium-content charges has been understood, perpetuated, and even encouraged by affiliate marketers, premium-content vendors, aggregators, and national telephone carriers, including Defendants.

28.    Defendants know that significant amounts of money have been collected because of such unauthorized charges for premium content over the last few years. Although Defendants can prevent the billing and collection of unauthorized premium-

content charges, they have chosen to maintain knowingly the flawed billing system that has allowed the continued collection of these unauthorized charges. Defendants have benefitted financially by retaining a percentage of these improper collections. Defendants, in particular, routinely process charges for premium content that have not been authorized by the billed party.

29.    Defendants have in the State of Minnesota and in the United States registered numerous transactions and processed substantial sums of money in transactions over recent years and have profited greatly from their arrangements with their aggregator partners and premium-content vendor partners.

30.    The rapid growth of the premium-content industry means that increasingly more consumers will be harmed by Defendants' unlawful conduct if it is allowed to remain unchecked.

**Allegations Specific To Plaintiff**

31.    During the relevant period, Plaintiff purchased from an authorized sales representative of a national telephone carrier new telephone service for her family's personal use.

32.    On the same day, in exchange for agreeing to a telephone service plan, Plaintiff agreed to pay a set monthly fee for a period of approximately 12 months.

33.    In or around January 2009, Plaintiff's telephone account was charged for unwanted and unauthorized premium-content products or services from Defendants.

34.    At no time did Plaintiff authorize the purchase of these premium-content products or services provided by Defendants.

35. During the relevant period, Defendants caused Plaintiff to be charged service fees for such premium-content services.

36. At no time did Plaintiff authorize or acquiesce to Defendants or anyone else to bill her for these premium-content charges.

37. Defendant has failed to refund Plaintiff the amount of these unauthorized charges, which consist of premium-content charges, data charges, taxes, and back interest, lost time disputing such charges, and/or assure Plaintiff that such unauthorized charges would not appear in future billing periods.

## CLASS ALLEGATIONS

38. Plaintiff brings this action pursuant to Minnesota Rule of Civil Procedure 23 on behalf of the following:

(A) A class ("Class") of all telephone subscribers in the State of Minnesota who suffered losses or damages as a result of billing for products or services of Defendant ClickSpark and/or of its affiliates including Defendant UnitedTel, that were not authorized by the subscriber; provided, however, that the following are excluded from this Class: (i) the Defendants; (ii) any employee of Defendants; (3) the District Court Judge assigned to this matter.

(B) A subclass ("Subclass") of all landline telephone subscribers in the State of Minnesota who suffered losses or damages as a result of billing by Defendant ESBI for services associated with Defendant ClickSpark or its affiliates, including Defendant UnitedTel, that were not authorized by the subscriber; provided, however, that the following are excluded from this Class: (i) the Defendants, and (ii) any employee of Defendants and (iii) the District Court Judge assigned to this matter.

39. The members of the Classes are so numerous and geographically dispersed that joinder of all members of the Classes would be impracticable. Members of the Classes are located throughout the State of Minnesota. The exact number of the members

of the Classes is unknown to Plaintiff at this time, but Plaintiff reasonably believes the Classes number at least in the hundreds or thousands.

40.     Plaintiff's claims are typical of the members of the Classes. Plaintiff and all members of the Classes were commonly impacted and damaged by Defendants' wrongful conduct. Plaintiff and the members of the Classes were charged by Defendants for "premium" telephonic products and services they did not authorize.

41.     Plaintiff will fairly and adequately protect the interests of the Classes. The interests of Plaintiff are coincident with, and not antagonistic to, those of the Classes. In addition, Plaintiff's counsel is experienced and competent in prosecuting complex class action litigation. Plaintiff and her counsel are committed to prosecuting vigorously this action on behalf of the other members of the Classes, and have the financial resources to do so. Neither Plaintiff nor her counsel has any interest adverse to the other members of the Classes.

42.     Absent a class action, members of the Classes would find the cost of litigating their claims to be prohibitive, and will have no effective remedy. Class treatment of common questions of law and fact also is superior to multiple individual actions or piecemeal litigation, in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

43.     The Classes have a high degree of cohesion, and prosecution of the action through class representatives would be unobjectionable. Plaintiff is not aware of any other difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

44.   The factual and legal bases of Defendants' liability to Plaintiff and to the

Classes are the same, resulting in injury to the Plaintiff and to the Classes.  Plaintiff and

the other members of the Classes all have suffered harm and damages as a result of

Defendants' unlawful and wrongful conduct.

45.   Questions of law and fact common to the members of the Classes

predominate over questions that may affect only individual members of the Classes.

Questions of law and fact common to the Classes include, but are not limited to the

following:

- Whether Defendants' conduct violated the Minnesota Deceptive Trade Practices Act and the Minnesota Consumer Fraud Act;

- Whether Defendants have unjustly received money belonging to Plaintiff and the Classes and whether principles of equity and good conscience dictate whether Defendants should be permitted to retain it;

- Whether Defendants are required to institute policies and procedures to ensure that their premium-content services and charges have been authorized; and

- Whether Defendants are required to institute policies and procedures to ensure that their premium-content services and charges can be cancelled upon request and refunds are available for any unauthorized premium-content services and charges.

46.   In the alternative, the Classes may be certified pursuant to Minn. R. Civ. P.

23.02(a) or 23.02(b) because:

a.   The prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendants;

b.   The prosecution of separate actions by individual class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other class members not

12

parties to the adjudications, or would substantially impair or impede their ability to protect their interests; and

c.   Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

**COUNT I**
**VIOLATION OF MINN. STAT. § 325D.44, *ET. SEQ,***
**DECEPTIVE TRADE PRACTICES ACT**
**(AGAINST ALL DEFENDANTS)**

47.   Plaintiff restates and realleges paragraphs 1-46 above as though set forth in full herein.

48.   Defendants failed to disclose to Plaintiff and the Classes that they would be charged for unauthorized third-party premium-content services if they used Defendants' services. This trade practice violates Minn. Stat. § 325D.44, subd. 1(5) (West. 2009) because Defendants represented that their services had characteristics, uses, and benefits they do not actually have. This trade practice also violates Minn. Stat. § 325D.44, subd. 1(13) because it otherwise creates a likelihood of confusion or of misunderstanding in the minds of consumers of these services.

49.   Defendants billed Plaintiff and the Classes for premium-content services without disclosing that such charges and services were unauthorized. This trade practice violates (a) Minn. Stat. § 325D.44, subd. 1(2) because it caused a likelihood of confusion or misunderstanding about the approval or certification of the premium-content services in the minds of consumers of these services; (b) Minn. Stat. § 325D.44, subd. 1(5) because they represented that the third-party premium-content services had the approval, characteristics, and benefits they do not have; and (c) Minn. Stat. § 325D.44, subd. 1(13)

13

because it created a likelihood of confusion or misunderstanding in the minds of consumers of these services.

50.     Defendant engaged in such acts and omissions intending that Plaintiff and the Classes would rely on their misrepresentations and omissions.

51.     Plaintiff and the Classes relied on Defendants' misrepresentations and omissions to their detriment.

52.     Defendants knew that their trade practices were deceptive and willfully, intentionally, and/or negligently engaged in them.

53.     The claims of Plaintiff and the Classes herein will benefit the public.

54.     Plaintiff seeks damages, together with costs and disbursements, including costs of investigation and other equitable relief (including disgorgement, restitution, imposition of a constructive trust, and an accounting) against Defendants for their violations of Minn. Stat. § 325D.44, et seq., as alleged above.

## COUNT II
## VIOLATION OF MINN. STAT. §§ 325F.68, *ET SEQ.,*
## PREVENTION OF CONSUMER FRAUD ACT
## (AGAINST ALL DEFENDANTS)

55.     Plaintiff restates and realleges paragraphs 1-54 above as though set forth in full herein.

56.     Defendants' services and the third-party content services at issue in this Complaint are "merchandise" for purposes of Minn. Stat. § 325F.68, subd. 2 (West. 2009).

57.    Defendants did not disclose to Plaintiff and the Classes that they would be charged for unauthorized premium-content services if they used Defendants' services. In addition, Defendants did not disclose to Plaintiff and the Classes that charges for premium-content services were unauthorized.

58.    These trade practices constitute fraud, misrepresentations, misleading statements, and/or deceptive practices in connection with the sale of merchandise (as it is defined under Minn. Stat. § 325F.68, subd. 2).

59.    Defendants engaged in these practices with the intent that Plaintiff and the Classes would rely thereon in connection with the sale of merchandise.

60.    Defendants thereby violated Minn. Stat. § 325F.69.

61.    Plaintiff and the Classes relied on Defendants' misrepresentations and omissions to their detriment.

62.    Defendants knew that their trade practices were deceptive and willfully, intentionally, and/or negligently engaged in them.

63.    The claims of Plaintiff and the Classes herein will benefit the public.

64.    Under Minn. Stat. § 8.31, subd. 3a, Plaintiff seeks damages, in an amount yet to be determined, but reasonably believed to be greater than $50.000.00 (fifty thousand dollars), along with costs and disbursements, including costs for investigation and reasonable attorneys' fees, and any other equitable relief (including disgorgement, restitution, imposition of a constructive trust, and an accounting) against Defendants for their violations of Minn. Stat. § 325F.68, et seq., as alleged above.

## COUNT III
## RESTITUTION/UNJUST ENRICHMENT
## (AGAINST ALL DEFENDANTS)

65.    Plaintiff restates and realleges paragraphs 1-64 above as though set forth in full herein.

66.    Plaintiff and the Classes have conferred a direct benefit on Defendants. Defendants have received and retained money, through a profit share or otherwise, belonging to Plaintiff and the Classes resulting from Defendants' conduct of billing and collecting unauthorized third-party premium-content charges.

67.    Defendants appreciate or have knowledge of this benefit and the fact that some of the monies they have received and continue to receive are resulting from their billing and collection of unauthorized third-party premium-content charges.

68.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and the Classes, which Defendants have been unjustly enriched as a result of Defendants' actions more fully described above.

69.    As a result of Defendants' retention of money belonging to Plaintiff and the Classes, Plaintiff and the Classes have suffered, and will continue to suffer, damages, in an amount yet to be determined, but reasonably believed to be greater than $50.000.00 (fifty thousand dollars).

WHEREFORE, Plaintiff Jennifer Cotton, on behalf of herself and the Classes,

prays for the following relief:

a)  Certification of this case as a class action on behalf of the Classes as
    defined above, appointment of Jennifer Cotton as Class Representative, and
    appointment of undersigned counsel as lead class counsel;

b)  A Declaration that the actions of Defendants, as set forth above, violate
    Minnesota law and constitute unjust enrichment, as set forth above;

c)  Entry of judgment against Defendants for all actual, monetary, economic,
    consequential, and compensatory damages in an amount yet to be
    determined, but in an amount greater than $50,000, caused as a result of
    their unlawful conduct;

d)  An Order for injunctive, declaratory, and equitable relief as necessary
    against Defendants to protect the interests of Plaintiff and the Classes,
    including an entry of an injunction enjoining the continuing of the acts
    alleged above, as well as disgorgement, restitution, imposition of a
    constructive trust, and an accounting;

e)  An Award to Plaintiff and the Classes of their reasonable costs and
    attorneys' fees; and

f)  An Award of any further relief as equity and justice may require.

### JURY DEMAND

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: February 18, 2009          LOCKRIDGE GRINDAL NAUEN P.L.L.P.


                                  By:
                                     Robert K. Shelquist (MN #021310X)
                                     Matthew R. Salzwedel (MN #0312903)
                                  100 Washington Avenue South, Suite 2200
                                  Minneapolis, MN 55401
                                  Tel:   (612) 339-6900
                                  Fax:   (612) 339-0981

rkshelquist@locklaw.com
mrsalzwedel@locklaw.com

Myles McGuire
KamberEdelson, LLC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel:    (312) 589-6370
Fax:    (312) 589-6378
mmcguire@kamberedelson.com

*Attorneys for Jennifer Cotton, individually, and
on behalf of classes of similarly situated
individuals*

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorneys and witness fees may be awarded to the party against whom the allegations in this pleading are asserted pursuant to Minn. Stat. § 549.211.

Dated: February 18, 2009

_____
Matthew R. Salzwedel (No. 0312903)

18